Case 12-6171, Michael Hoback v. City of Chattanooga Tennessee. Oral argument not to exceed 15 minutes per side. Mr. Noblitt for the appellant. May it please the Court, I'm Phil Noblitt from Chattanooga, Tennessee, representing the City of Chattanooga in this matter, and I would request at least a little bit of time of about three minutes at the end. In this case, there is a jury verdict against the City of Chattanooga in an ADA case involving a police officer who was at least involuntarily committed. That proof was in the record concerning this individual. After his involuntary committal, he was released from the VA hospital in Murfreesboro, Tennessee, underwent an evaluation. That wasn't involuntary, was it? Yes, ma'am. Well, it was involuntary insofar as that he left the VA in Chattanooga and went over and voluntarily committed himself, but it was an involuntary committal at the time. That's how the police department found out. Well, the doctor thought he should be involuntarily committed, but he never was. He was actually checked himself in over in Murfreesboro. That's not how involuntary commitments would typically work. All the paperwork was out there at that point in time, and that's the reason the police department got involved. So once that decision at least was made at that point in time and Mr. Hoback was treated, the police chief in this case requested a psychological evaluation. That psychological evaluation was performed by a fellow by the name of Brookshire. Mr. Brookshire determined that Mr. Hoback was not fit to perform the duties as a police officer, and he determined that because of his pattern of excessive anger, suicide and homicide thoughts, and impulsive and aggressive acting out behaviors, that he should not be continuing to operate as a patrol officer. Based upon that report, that was the only report which was in front of Chief Cooper at the time he was at least required to make a decision on continuing him as a police officer. This went on for about three months, I think, over the summer from April to July the 31st when he eventually made the decision to terminate him. Isn't it part of the problem here that he knew that another report was coming and didn't take that report into account? I don't think so. The problem with the other report... One of the problems, one of the things that... Potentially, possibly for a jury, possibly. Makes the case a jury question is that, you know, he's required to make an individualized assessment. He knows that another report is coming, but he doesn't take that report into account in his decision. He had at least a verbal report at the time he made the decision, and at that point in time... He knew the report that was coming was contrary to the one in his hand. He did also know at that point in time it required conditions for the employment of Mr. Hoback, including having a psychological evaluator basically follow him around and to have reports on whether Mr. Hoback was a danger to himself or others. So are you saying that the chief was entitled to rely solely on that first report, even though the second report, the report from Dr. McDaniel, was somewhat different? And it acknowledged that he may have been not fit at that time, but now, you know, with certain accommodations, with certain monitoring, he's okay. Was he entitled, the chief, entitled to disregard Dr. McDaniel's report altogether? I believe the chief was entitled to deal with the reports he had in front of him at the time and the information that he had in front of him at the time he made the decision. And that was at least a verbal report from Mr. McDaniel that he would have to have a number of conditions attached to his continuing to work. I believe the chief considered that and determined that he could not make that determination. I don't think reasonable accommodations at this point in time are required on a situation where there is just merely a perception type claim as well under the ADA. But is the chief entitled to regard him as a person with a disability or as disabled in the face of information that states or suggests that perhaps he's not? I think the chief has to deal with what information he has at the time in making that determination. And he did that in this case in trying to determine whether this would be a position for someone to return to patrol. And my point is dealing with the report he has at the time, that's all well and good. But when he gets a subsequent report, what are his obligations with respect to that report at that time that is now squarely before him and in his hands? That subsequent report he has to deal with and has to determine whether someone with those conditions could be continued to allow to work. I guess the question here, the perception portion of it, I believe the ADA in 2009 actually removed some of those requirements, at least as to perceived disabilities and reasonable accommodations. The issue here, I believe, and it caused Judge Collier a lot of concern below on this matter because it was dealing with case law pre-2009 and post-2009 case law. They were looking at the case law of this court in Worzel versus Whirlpool to determine what the standards would be in this case under the ADAA. And that is my concern in this case as to what a police chief is supposed to do under these circumstances. It's very difficult for him to make determinations to put someone back in the street with a gun as a patrol officer every day performing their duties and rely upon them based upon this record. This record clearly established that Mr. Hoback was telling to his personnel that he was talking to at the VA that he was having suicidal and homicidal thoughts. Chief did not know any of that information. Once he learns that information, he has some duty to act for the safety of the public and for other officers that are out there. Those statements are downplayed by much of the medical proof in this case, but simply by saying that Mr. Hoback embellished or lied about those statements in order to get more benefits from the VA. But that's a real concern for a police chief who is dealing with folks every day in the field that he has to trust to use a gun and to be able to properly use the force levels that the police department has in effect.  The police chief is in a difficult situation, but as I understand Mr. Hoback's argument, it's not only that the chief did not wait for the second opinion and report that he knew was coming, but also that Dr. Brookshire's report was, at the end of the day, objectively unreasonable. And it's hard for a police chief to know that, but at least you would think there would be a duty to wait until you had all the medical evidence in front of you. I would argue that a police chief can't be a psychological expert. A police chief can only rely upon that information that is available. If there is an argument about acting prematurely in connection with this case, I can understand that, but the two reports that were available to him at the time did not say that this person could go back to work as a patrol officer every day without conditions involved. The concern, I guess, as to Dr. Walker's report, is he basically says he's healed. And I think that's one of the inherent problems that you have in connection with a mental question here under PTSD, whether that is a continuing problem where it may change based upon what someone tells someone at a later time. Even if it's difficult for a lay person to second guess a medical opinion, the chief would at least have known that Dr. Brookshire had not, in fact, personally examined Mr. Hoback and was relying on records, correct? That Mr. Hoback had not, he had been examined by another person and there was not a written report at that point, yes, ma'am. The concern, I guess, that I would have in this case is that other circuits have considered these issues on the aspect of what is a person who has got a problem that limits a major life activity. I've cited a number of the Eighth Circuit cases here, the Epps versus Pine Lawn case, the Sheehan versus City of Gloucester case, and also the Baker versus Windsor Republic Doors case. Judge Daughtry wrote that in 2006. At that point in time, I know we had slightly different standards under the ADA than we do at this point in time, but Judge Daughtry in that case affirmed a jury verdict for Mr. Baker, who is the plaintiff on that matter, but it was affirmed on the basis of retaliation, and I do not believe that there is any evidence of retaliation in this record. The only claim the plaintiff has got is a perceived disability claim and discrimination under the ADA in this matter. Mr. Noblitt, I'm supposing that Mr. Hoback was on leave while these medical reports were coming in. Is that correct? He wasn't out on parole while the chief was? Yes, ma'am. He was out on administrative leave. The administrative leave was running out, and he would not choose FMLA. That was another problem that they had. The personnel department attempted to get him to use FMLA leave, but he would not do that, saying he did not have a condition that would warrant FMLA leave. I don't know if it's not a serious mental injury or a claim in that regard. Who determines the amount of administrative leave? The administrative leave for the city, just basically you have a certain amount of it banked up. You have a certain amount of it administratively that you accrue each year. It ran out, and that was the concern. He could have been placed on leave without pay. He could have, I guess. Leave with pay, for that matter. In fact, if the FMLA had been chosen, that's what could have occurred, and he could have extended that period of time under the FMLA for leave without pay, even though there was no more paid leave available. And that would have maybe allowed us more opportunity. I think Judge Daughtry is trying to ask a question, and it's hard, a little bit hard. I was interrupting her, too, which I didn't mean to do. Oh, no, no problem. Was there anything in those reports, and of course we'll look at them more closely, but was there anything in those initial reports that indicated that PTSD was treatable? I guess the treatable aspect of it was not. There was actually medication that was being provided to him. We learned in the reports he was not taking his medication. He had been prescribed with lithium at some point in time. He had not told the police chief that he was on any medication and apparently was not taking the medication as prescribed. Okay, but that's not my question. But was there notice that this was a treatable condition? I do not know of any reference. And PTSD, I believe, is a treatable condition. The question is were there other things that should have been looked at in his job position while that was going on. All right, thank you. I would like to at least address slightly the direct threat part, and I'll do that on my rebuttal opportunity in a moment. But we have cited the court on our original brief and our reply brief a number of direct threat cases in this circuit and other ones. The only case I could find on direct threat within the Sixth Circuit was the Hamlin v. Township of Flint case back in 1999. It clearly involved a police, excuse me, a fire chief at that point, and reviewing 42 U.S.C. 12113, they determined that if someone was a direct threat, they could not qualify for protection under the ADA. That was the only case that I'm aware of, and it did not involve a police officer who had a gun going out every day. If I can reserve my remaining three minutes, I would appreciate it. Mr. Lawrence. May it please the court, I'm Phil Lawrence from Chattanooga, and I represent Michael Hoback in this appeal. At the outset, I think the record should be fairly evident in the record that Chief Freeman Cooper was under the mistaken belief that Tennessee law provided that if a police officer has any diagnosable mental condition under the DSM-III or any later edition, that they were automatically disqualified as a police officer. He is the decision maker in this case who started the process that brought us here, and he concluded that because Mr. Hoback was diagnosed with this condition of PTSD, that he couldn't serve as a police officer, regardless of the severity or how it may have affected his job. That's clear from the record. He was unaware of the case of the United States v. State of Tennessee where a consent order was entered that called that statute into question, and the city was still operating under the belief that that was the operative law. So given Chief Cooper's state of mind, it's not unusual that he completely ignored the report of Dr. Terrell McDaniel. I understand how this case all unfolded, but you're not suggesting that the chief's concerns were not in some sense reasonable, as Mr. Noblitt said. This person was out on the street with a gun, and there was this condition which the first report said he's not fit. So the chief has an obligation to officers and to the community. And didn't the chief offer Mr. Hoback, or encourage him to look at other positions within the city, which your client completely and totally rejected out of hand? Well, the positions were much different than the position that he had been serving in. They were telephone answering jobs, things of that nature, that simply didn't appeal to him. And he felt that he was able to do the job and certainly had a history of very high competence in his job. Let me say that Chief Cooper's obligations in this situation go further than just getting a medical report. In fact, when Chief Cooper got the medical report, it was almost game over for him from Dr. McDaniel. He said, not fit, you're out the door. The CFR, the Code of Federal Relations Provision 29 CFR 1630.2 subsection R says that an individualized inquiry is required that relies on a reasonable medical judgment based on the current medical knowledge. And the current medical knowledge in this context, I believe, would be Dr. McDaniel's report. That was the current medical knowledge at the time that the decision was made. He had knowledge, it was on notice, that there was a contrary opinion to that of Dr. Brookshire. Also, the regulation provides an and or provision on the best available objective evidence. Now, what we have is a situation where Mr. Hoback had gone to Iraq, he came back to the city of Chattanooga, resumed his job in November of 2005. In 2006, he got an award from the Chief for his performance as a police officer. In 2007, he got the award as Officer of the Year. The best officer in the entire Chattanooga Police Department. So you would think that when Chief Cooper got this report saying he's not fit for duty, some kind of alarm would go off. How could this be? Two years ago, this guy is the best police officer in the entire force. The testimony from his fellow officers are that he was highly competent. Even Chief Cooper acknowledged what high performance this officer had given to the city of Chattanooga. So you've got two things. Not just the medical evidence, but it has to be based upon objective, the best available objective evidence. So certainly, Chief Cooper has got more of an obligation than just to defer to a medical opinion. It sounds like what the jury may have found that happened here was two things. One, that Chief Cooper relied on a Tennessee statute, which was, in fact, in some tension with what the requirements of the ADA were. And he was both unaware of the requirements of the ADA and did not seek to perform the process that was required by the ADA because he, in fact, thought that the evidence he had before him of a mental disorder was determinative. I think that's exactly what the jury found. And they found that, number one, that Officer Hoback could perform the essential functions of the job and that he had done that and there was no evidence that he had ever failed to do that, that any risk was tentative, speculative. And in terms of the direct threat analysis, I don't think the city ever offered any evidence about what the likelihood of potential harm was. That was one of the elements. And certainly there was no imminence of potential harm based upon any of the testimony that was given in the case. And if I could clear up one fact that's been misstated, in my view, is what Dr. McDaniel said about these conditions of his being returned to work. In his report, Dr. Terrell McDaniel says this, Mr. Hoback is fit for duty and should be returned to work as a patrol officer without restriction. He is not psychotic and there's not evidence, there should be no evidence of his significant symptoms or signs that this time, which would, I guess that should be at this time, which would preclude his return to normal duties. Nevertheless, administration may wish to choose a position that provides acceptable levels of monitoring at the beginning of his re-engagement. He doesn't say in there that he requires accommodations. And I don't think a jury would conclude that he needed accommodations which are not under the as regarded as prong of the test required. I think that's all I have to address. Thank you very much. All right, Mr. Noblitt. Briefly, there was no written report from Dr. McDaniel provided to the City of Chattanooga until August the 31st of 2009. The decisions regarding continuation of employment were July the 31st of 2009. That is specifically laid out in the record in this court under ID page 2190 of the record. Terrell McDaniel gave his opinion at that point in writing. He had only given verbal comments to the personnel director and to Chief, I think which were relayed to Chief Cooper before the termination date. Mr. McDaniel in his opinion here, I think at pages 2191 and 2192, specifically wrote that because Mr. Hoback's inaccurate statements to his counselor, he would normally consider Mr. Hoback to be not fit for duty and it would support a not fit termination. And Mr. McDaniel in his report here at pages 2197 and 2198 in your record said that Mr. Hoback could only return to police duties if a number of adequate monitoring conditions were met. One of those was having a professionally licensed counselor employed by Hoback or the city to make determinations on whether he should be on duty as a police officer at any time. I would submit that that is an inordinate burden to impose on police departments to require someone to have a licensed counselor to say that they're fit for duty each day. Police departments can't operate that way. I know that it says each day, but it might have been a reasonable decision if that in fact had been the process that ensued. And perhaps if that had been taken into account, perhaps the jury might have come to a different conclusion about the end result of the case. But that's not what in fact happened because that was never considered. But the requirements of the ADA do not require police departments to go out and hire someone to determine whether someone is fit daily here to go out in the street and use a gun. That is a concern that a police chief should reasonably have. My point is that's not something that was taken into account in the decision. Well, whether someone can fulfill the essential functions of their job has to be taken into decision by the folks that are making a determination on awarding damages under the ADA. And we cited in our reply brief the McDonald v. Pennsylvania State Police case, a 2012 decision that occurred since our initial filing on May the 10th, and Diaz v. City of Philadelphia, which are post-ADAA cases that have both determined that the essential functions of a police officer's duties and questions should be resolved within the departments and not necessarily the court system on these types of matters, especially when you're dealing with a mental disability concern and a concern about whether an officer is telling you the truth. That is a situation that Chief Cooper was involved in in this case. Thank you. We appreciate the argument both of you have given, and we'll consider the case carefully. Thank you.